Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| Adedapo Abiodun and Heyden Petroleum, Ltd.<br><br>Plaintiffs,<br>v.<br><br>Smith Maritime Inc.; Marcon International, Inc.; Tug Elsbeth II *in rem*; and DOES 1 through 20,<br><br>Defendants. | Case No.:<br><br>**VERIFIED ADMIRALTY AND MARITIME COMPLAINT (*In Personam* and *Rem*) FOR DAMAGES**<br><br>**(1) Breach of Written Contract;**<br>**(2) Fraud;**<br>**(3) Breach of Oral Contract;**<br>**(4) Breach of Fiduciary Duty;**<br>**(5) Negligence.**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Adedapo Abiodun ("Plaintiff Adedapo") and Heyden Petroleum, Ltd. ("Plaintiff Heyden") (collectively "Plaintiffs") allege as follows:

## JURISDICTION AND VENUE

1) This action seeks recovery for the breach of a maritime contract, and this Court therefore has jurisdiction over all of the claims asserted herein pursuant to 28 U.S.C. § 1333. This is also an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2) Jurisdiction also lies under 28 U.S.C. § 1332 as complete diversity of citizenship exists between Plaintiffs and defendants.

3) Plaintiff Adedapo is, and at all relevant times was, a citizen of Nigeria and C.E.O. and managing director of Plaintiff Heyden, an oil trading company incorporated in Nigeria and with a principal place of business in Lagos, Nigeria.

4) Defendant Smith Maritime Inc. ("Smith Maritime") is a Florida corporation with its principal place of business in Jacksonville, Florida.

ABIODUN.SMARITIME

5) Defendant Marcon International, Inc. ("Marcon International") is a Washington corporation with its principal place of business in Coupeville, Washington.

6) The oceangoing tug Elsbeth II is a US Flag ocean going tug of 139 gross tons and was at all material times owned and operated by defendant Smith Maritime. The Elsbeth II was contracted through Smith Maritime to tow the barge M – 300 from Tampa, Florida to offshore Lagos, Nigeria. The Elsbeth II is presently located within the jurisdiction of this court or will be during the pendency of this action.

7) The total amount in controversy exceeds $75,000.00 exclusive of interest, attorneys' fees and court costs.

8) Plaintiffs are ignorant of the true names and capacities of defendants sued as Does 1 through 20, inclusive, and therefore sue those defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

9) Venue is proper in this Court because Smith Maritime is a corporate citizen of the State of Florida, its principal place of business is to be found within the Middle District of Florida, the International Ocean Towage Agreement that is the subject matter of this lawsuit ("Towcon") includes a venue provision designating Jacksonville, Florida as the venue, the tug Elsbeth II is presently or will be within the District, and because a substantial part of the events or omissions giving rise to the claim occurred in this District. A copy of the Towcon is attached hereto as Exhibit "1."

10) As set forth more fully below, the causes of action arose on or about September 25, 2009 when defendants Smith Maritime and the tug Elsbeth II breached their contract and abandoned the barge and when Marcon International transferred funds it held in trust for Plaintiffs without authorization.

11) In addition, on or about May 24, 2010, Plaintiffs and Smith Maritime entered into a tolling agreement to toll the 1 year contractual limitations period for claims arising under the Towcon between Plaintiffs and Smith Maritime as set forth in Part II, Paragraph 24 of the Towcon. Pursuant to the tolling agreement, Smith Maritime agreed

to provide 30 days notice of termination of the tolling agreement. On or about August 17, 2010, Smith Maritime terminated the tolling agreement. As a result of the tolling agreement, the one year contractual limitation period was tolled for a period of 84 days (May 24 – August 17, 2010).

12) This action is timely filed.

**GENERAL ALLEGATIONS**

13) Plaintiffs incorporate by reference herein each and every allegation contained in paragraphs 1 through 12 above.

14) Marcon International acts as a broker for the sale of vessels, barges and other marine equipment between individuals and companies worldwide. Marcon International also acts as a broker for the towing services of vessels, barges and other marine equipment.

15) In addition to acting as a broker, Marcon International acted as an escrow agent ("Escrow Agent"), on behalf of Plaintiffs with respect to the transactions described below. As an Escrow Agent, Marcon International held certain funds of Plaintiffs on deposit in a trust account. Marcon International was required to hold the funds, in trust for Plaintiffs, until the seller or provider of services had fulfilled its obligations to Plaintiffs and Marcon International received specific written instructions to release the funds to the seller or provider of services.

16) Smith Maritime is a tugboat company that provides tug and towing services of marine vessels, barges and other marine equipment within the United States and to other countries.

17) During the second quarter of 2009, Marcon International brokered, on behalf of Plaintiffs as purchasers, the purchase of a double hulled, ocean tank barge ("Barge").

18) Marcon International also secured, on behalf of Plaintiffs, the tug and towing services from Smith Maritime to tow the Barge from Tampa, Florida to Lagos, Nigeria.

19) On or about June 3, 2009, Plaintiffs and Smith Maritime entered into a towage contract entitled "International Ocean Towage Agreement" ("Towcon").

20) Pursuant to Part I, "Boxes" 22 to 25 of the Towcon, Smith Maritime agreed to tow the Barge from "Tampa, Fl USA" and deliver the Barge to "Offshore Lagos, Nigeria." Pursuant to Part I, "Box" 32 of the Towcon, Plaintiffs agreed to pay Smith Maritime a total sum of "$1,075,000.00" (one million seventy five thousand dollars and no cents) ("Towcon Price") for the tow. Pursuant to Part I, Box 32 of the Towcon, Plaintiffs were required to make payments for the tow based on the following schedule:

a) "10% due upon signing contract";

b) "30% on arrival Tampa, Florida";

c) "30% due after passing 45 degrees west longitude";

d) "Balance due upon delivery [of the Barge] Offshore Lagos".

21) Pursuant to Part II, Paragraph 2(c) of the Towcon, the amount set forth above was not earned until the date on which the "payment" was "due."

22) In this case, the final payment of 30% [$322,500.00 (three hundred twenty two thousand five hundred dollars)] was therefore not "earned" until the barge was actually delivered to Plaintiffs or their authorized representatives at "Offshore Lagos, Nigeria." Paragraph 8(a) of the Towcon states "[t]he Tow shall be accepted forthwith and taken over by the Hirer or his duly authorized representative at the place of destination stated in Box 25 [Offshore Lagos, Nigeria]."

23) Additionally, pursuant to the Towcon, Plaintiffs set the actual place of destination at Offshore Lagos, Nigeria. Part II, Paragraph 8(b) of the Towcon states "[t]he precise place of destination shall always be safe and accessible for The Tug and Tow to enter, to operate in, and for the Tug to leave and shall be a place where such Tug is permitted to redeliver the Tow in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the tugowner, which approval shall not be unreasonably withheld."

24) Pursuant to Part I, Box 36 of the Towcon, the cost of the tug's bunker fuel was included in the lump price of tow. The Towcon also provided, however, that if the "average price per metric tonne of bunkers actually paid by the Tugowner differs from the amounts

specified in Box 36 then the Hirer or the Tugowner, as the case may be, shall pay to the other the difference per metric tonne for every metric tonne consumed during the voyage. ***The average price specified above shall be the average of the prices per metric tonne actually paid by the Tug owner on the basis of quantities purchased at the last bunkering port prior to the voyage, any bunkering port during the voyage, and the first bunkering port after completion of the voyage.*** " [Emphasis added]. Part I, Box 36 of the Towcon set the fuel cap charge at $1.85 per U.S. gallons.

25) At all relevant times, Marcon International acted as the broker on the Towcon and undertook to hold certain funds in trust related to the purchase and tow of the Barge. Marcon International created an escrow account ("Escrow Account") for Plaintiffs' benefit to facilitate payments from Plaintiffs to Smith Maritime for work performed pursuant to the Towcon.

26) To fund the Escrow Account, Plaintiffs on various dates transferred money to Marcon International for deposit to the Escrow Account and eventual payment to Smith Maritime as the payments came due. Marcon International and Plaintiffs agreed or understood that Marcon International would remit payment from the Escrow Account to Smith Maritime at the schedule agreed upon in the Towcon, but only after being given Plaintiffs' express written permission to do so.

27) Pursuant to paragraph 32 of the Towcon, after the signing of the Towcon, and only after Plaintiffs gave express permission to do so, Marcon International paid to Smith Maritime from the Escrow Account, 10% of the Towcon Price.

28) Pursuant to paragraph 32 of the Towcon, after Smith Maritime's tug Elsbeth II arrived at Tampa, Florida, on or about June 2009, and only after Plaintiffs gave express permission to do so, Marcon International paid to Smith Maritime from the Escrow Account, 30% of the Towcon Price.

29) Pursuant to paragraph 32 of the Towcon, after Smith Maritime's tug Elsbeth II towed the Barge past 45 degrees west longitude, and only after Plaintiffs gave express

permission to do so, Marcon International paid to Smith Maritime from the Escrow Account, 30% of the Towcon Price.

30) On or about September 15, 2009, and before completing the voyage, Smith Maritime demanded payment of an additional $76,991.00 in fuel cap charges. Under protest that the entire fuel cap charges were excessive or fraudulent, Plaintiffs authorized Marcon International to pay Smith Maritime an additional $50,000 from the Escrow Account.

31) On or about September 15, 2009, and before completing the voyage, Smith Maritime wrote to Marcon and Plaintiffs refusing to complete the voyage unless and until pre-payment was made of both the final tow payment and payment of a fuel surcharge, neither of which had been earned pursuant to the terms of the towcon. Smith Maritime wrote:

> Hi Jeff -We are getting close to final destination and hand-off. We are due a final payment lump sum voyage for the 4th payment and invoice for fuel cap reimbursement. **See attached invoices. Understand you are out of funds to send to us to complete this voyage.** Please understand that we are not willing nor will proceed past Togo border unless full payment is made. Hirer must make arrangements for full payment to our account or via your account as soon as possible. Attached are the invoices due and we must establish payment schedule before we proceed much longer. If we are in Togo waters and have not recieved full payment we will divert and remain on stand by demurrage until full payment is made.

32) Plaintiffs protested that "The terms were for them to deliver to offshore Lagos and then get paid." Smith Maritime responded that if they did not get pre-payment they would "slow steam on demurrage until funds are received adding additional costs to Hirer."

33) On September 17, 2009 Smith Maritime wrote again stating:

> Good Morning - Attached is the morning report. Weather is good, current favorable but no fish. Tug is 215 nm from Lome Togo and 350 nm from Lagos - ETA Saturday Sept 19 1200 GMT.
>
> NOTE: Tug will not pass Lome Togo or enter Nigerian waters until all funds due , as invoiced, are deposited and confirmed in MARCON 's account. Tug will arrive offshore Lome Friday morning (tomorrow) and has been ordered to slow steam on demurrage until further notice. Any other port costs or expenses due to non payment, will be to hirers account.
>
> Regards,
> Caprice Welton

ABIODUN.SMARITIME

    Vessel Operations
Smith Maritime Inc.

34) Plaintiffs responded on September 17, 2009 reminding Smith Maritime that "you are to deliver barge to us offshore Lagos and only then your payment will be effected when barge is confirmed to have arrived offshore Lagos , your balance of $322,500 will be paid on confirmation of safe arrival of barge and upon delivery offshore Lagos !! See item 32 (e) in tow con. Any demurrage incurred otherwise will be to your account!!"

35) As of September 1, 2009, Marcon International was holding in its trust account for Heyden Petroleum, the sum of $321,521.80.

36) On September 18, 2009 Plaintiffs were informed by Marcon International that Smith Maritime had anchored the barge in Lome (Togo) and refused to make the contracted delivery until all funds to cover both the final lump sum payment and all as then unearned fuel surcharges were deposited in Marcon International's trust account held for Heyden Petroleum. Smith Maritime also refused to make delivery of the barge to the Heyden Petroleum dock.

37) The funds demanded by Smith Maritime were not earned or owed until the barge was delivered.

38) As of September 24, 2009, Plaintiffs had funds on account in trust with Marcon International of $410,536.80.

39) On September 25, 2009, Plaintiffs received notice from Marcon that the barge had been abandoned by Smith Maritime as follows:

> Barge is anchored at 06 18.5 N X 003 19.7 E. It is in 80 ft of water with 5 shots chain, set and holding good. Crew put 2 battery powered anchor light on. Bridle is tied off to stbd side deck, eye is right at water.
>
> Barge paperwork is in plastic taped to gen set. Instructions for gen set are taped to top of water jug in generator room. Pick up crew will need two hot 12 volt batteries for 24 volt start. Anchor windless set for raising anchor. Gen set leaks water. Fresh water is in jugs to resupply gen set while raising anchor.
>
> Reported by Capt John, submitted by Caprice @ Smith Maritime

40) Although the barge had been abandoned by Smith Maritime and the tug Elsbeth II, Marcon International paid from the Escrow Account to Smith Maritime, the remaining 30% of the Towcon Price. This payment was made without any authorization from Plaintiffs and despite the fact that the tow contract had not been fulfilled by Smith Maritime.

41) Even after receiving the final payment, Smith Maritime failed to take further action to safeguard and deliver the Barge to Plaintiffs pursuant to the contract terms. In fact, Smith Maritime negligently abandoned the Barge, leaving the Barge without any crew to maintain the Barge or safeguard or protect the Barge from theft, vandalism, other intentional, criminal or negligent acts, and from other conditions, including weather and the sea.

42) As a consequence of Smith Maritime's negligence, the Barge suffered damage, including theft of its equipment.

43) As a direct and proximate result of the above described breaches of contract, breaches of fiduciary duty, fraud, and negligence, Plaintiffs have been damaged in an amount in excess of $1,000,000.

**FIRST CAUSE OF ACTION**
**[Smith Maritime, Tug Elsbeth II, in rem, and DOES 1-20]**
**[Breach of Written Contract]**

44) Plaintiffs incorporate by reference herein each and every allegation contained in paragraphs 1 through 43 above.

45) Plaintiffs and Smith Maritime entered into a written contract, the Towcon.

46) Plaintiffs fully performed each and every obligation, condition, covenant, and promise required under its contract with Smith Maritime.

47) All of the conditions required by the Towcon for Smith Maritime's performance had occurred.

48) Smith Maritime breached the Towcon as described herein, by among other things, demanding reimbursements for excess fuel expenditures before the completion of the

voyage, by overcharging on fuel cap charges, by failing to deliver the Barge to Plaintiffs or their authorizes representatives at Offshore Lagos, Nigeria,

49) As a result of Smith Maritime's breach, Plaintiffs have sustained damages as described herein and as set out in the prayer below, according to proof.

**SECOND CAUSE OF ACTION**
**[Smith Maritime and DOES 1-20]**
**[Fraud]**

50) Plaintiffs incorporate by reference herein each and every allegation contained in paragraphs 1 through 49 above.

51) On or about June 3, 2009, in Jacksonville, Florida, Smith Maritime fraudulently represented to Plaintiffs that it would complete the voyage pursuant to the express terms of the Towcon including proper delivery and turnover in a professional and workmanlike manner and would not demand pre-payments of unearned fees or expenses.

52) The subsequent behavior of defendant Smith Maritime in demanding pre-payments of unearned fees and expenses and abandonment of the tow despite receipt of unearned payments establishes that defendants never intended to complete the Towcon pursuant to its express terms.

53) At the time they entered into the Towcon, Smith Maritime II knew that each of the statements were false.

54) Smith Maritime intended that Plaintiffs would rely on the false statements.

55) Plaintiffs relied on the false statements.

56) As a result of the fraudulent statements and actions of Smith Maritime, Plaintiffs have sustained damages as described herein and as set out in the prayer below, according to proof.

**THIRD CAUSE OF ACTION**
**[Breach of Written and Oral Contract]**
**[Marcon International and DOES 1-20]**

57) Plaintiffs incorporate by reference herein each and every allegation contained in paragraphs 1 through 56 above.

58) Plaintiffs and Marcon International entered into a contract partly oral and party in writing pursuant to which Marcon International agreed to act as brokers and Escrow Agents for Plaintiffs for the tow of the Barge from Tampa, Florida to Lagos, Nigeria.

59) The terms of the oral and written contract required Marcon International to hold the funds deposited with it for the benefit of Plaintiffs and to not release these funds to third parties unless and until it received written authorization from Plaintiffs for the release of the funds.

60) On September 24, 2009 Marcon International was holding in trust for the benefit of Plaintiffs the sum of $410,536.80.

61) Plaintiffs performed all actions required of them pursuant to their oral and written agreements with Marcon.

62) All of the conditions required by the oral contract for Marcon International's performance had occurred.

63) On or about September 25, 2009 Marcon International breached its contractual obligations to Plaintiffs by releasing to defendants Smith Maritime and the tug Elsbeth II payments of at least $399,491.00.

64) Plaintiffs did not, and would not have, authorized the payments to Smith Maritime and the Tug Elsbeth II in light of the abandonment of the Barge by Smith Maritime and the tug Tug Elsbeth II, and the fact that the sums so released had not yet been earned pursuant to the terms of the Towcon.

65) As a result of Marcon International's breach, Plaintiffs have sustained damages in excess of $399,491.00.

ABIODUN.SMARITIME

**FOURTH CAUSE OF ACTION**

**[Breach of Fiduciary Duty]**
**[Marcon International and DOES 1-20]**

66) Plaintiffs incorporate by reference herein each and every allegation contained in paragraphs 1 through 65 above.

67) By acting as Plaintiffs' broker on the purchase of the Barge, and for the towing of the Barge, and by acting as Plaintiffs' Escrow Agent, Marcon International owed a fiduciary duty to Plaintiffs. Plaintiffs depended on Marcon International to act as its fiduciary. Macron International agreed to hold Plaintiffs' funds and to not distribute the funds without authorization from Plaintiffs.

68) Marcon International breached that fiduciary relationship and its fiduciary duty to Plaintiffs by releasing the final (and as yet unearned) payment for towage and fuel cap surcharges to Smith Maritime even though Smith Maritime had not performed its obligations pursuant to the Towcon and did not provide a proper accounting regarding the fuel surcharges. Plaintiffs never authorized Marcon International to release the funds.

69) As a result of Marcon International's breach of fiduciary duty, Plaintiffs have sustained damages as described herein and as set out in the prayer below, according to proof.

**FIFTH CAUSE OF ACTION**
**[Marcon International and DOES 1-20]**
**[Negligence]**

70) Plaintiffs incorporate by reference herein each and every allegation contained in paragraphs 1 through 69 above.

71) Marcon International owed a duty to Plaintiffs to safeguard, protect and hold Plaintiffs' money in the Escrow Account, until Smith Maritime's tug Elsbeth II delivered the Barge to Plaintiffs at Offshore Lagos, Nigeria and until Plaintiffs had given Marcon International specific written permission to pay Smith Maritime with money from the Escrow Account.

72) Marcon International also owed a duty to Plaintiffs to safeguard, protect and hold Plaintiffs' money in the Escrow Account for payment of fuel cap surcharges, if any,

until a full and proper accounting of such charges was provided by Smith Maritime and until authorization was given by Plaintiffs to release said funds.

73) Marcon International failed to meet the required standard of conduct when it released Plaintiffs' money from the Escrow Account, without confirming Smith Maritime's delivery of the Barge to Plaintiffs pursuant to the terms of the Towcon, without receipt of a proper accounting and without Plaintiffs' express written permission.

74) Marcon International's conduct was a legal cause of injury to Plaintiffs, as described herein;

75) As a result of Marcon International's negligence, Plaintiffs have sustained damages as described herein and as set out in the prayer below, according to proof.

## PRAYER

**WHEREFORE**, Plaintiffs pray for judgment against Smith Maritime, the tug Elsbeth II and Marcon International and Does 1 through 20, inclusive, as follows:

1. That a Warrant of Arrest issue against the Vessel;
2. That the Vessel be arrested and preserved pursuant to the practice of this Court in cases involving maritime liens and Preferred Ships Mortgages against vessels in navigation, as provided by the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure and the Rules of this Court;
3. Refund of the unearned fourth payment under the Towcon of $322,500.00;
4. Refund of the unearned fuel surcharges of at least $76,991.00;
5. Refund of unearned brokering and escrow fees by Marcon International;
6. For damages to the barge and its equipment and for lost profits from the inability to use the barge all in excess of $1,000,000.00;
7. For added costs associated with handling, storage, and movement of the Barge according to proof;
8. Attorneys' fees, costs and expenses;
9. Prejudgment interest;
10. Costs of suit herein; and
11. For such other relief as this Court deems just and proper.

**Plaintiffs also hereby demand trial by jury.**

Dated: September 20, 2010

**HOLLAND & KNIGHT LLP**

Timothy J. Conner, Esq.
Florida Bar No. 767580
50 North Laura Street
Suite 3900
Jacksonville, Florida 32202
Telephone: (904) 353-2000
Facsimile: (904) 358-1872
Attorneys for Plaintiffs

ABIODUN.SMARITIME

#9783846_v1

-13-

Case No.

VERIFIED COMPLAINT FOR DAMAGES

**VERIFICATION**

I, Adedapo Abiodun, hereby state:

1. I am an officer of Heyden Petroleum, Ltd., a Plaintiff in the instant action.

2. I have read the contents of the above Complaint on behalf of Heyden Petroleum, Ltd. and myself, and hereby verify the facts contained therein are true and correct to the best of my knowledge, information and belief.

3. I am authorized on behalf of Heyden Petroleum, Ltd.. to verify this Complaint.

I declare under penalty of perjury under the laws of the State of Florida and the United States that the forgoing is true and correct and that this verification was executed at Lagos, Nigeria on September 20, 2010.

Adedapo Abiodun

Recommended by
International Salvage Union (ISU)
European Tugowners Association (ETA)
The Baltic and International Maritime Council (BIMCO)

Printed by BIMCO's *idea*

Copyright, published by
The Baltic and International Maritime Council (BIMCO)

| 1. Date and place of Agreement<br>JUNE 03, 2009 | RECOMMENDED<br>INTERNATIONAL OCEAN TOWAGE AGREEMENT (LUMP SUM)<br>CODE NAME: "TOWCON" PART I |
|---|---|
| 2. Tugowner/place of business<br>SMITHMARITIME INC.<br>967 BULKHEAD RD.<br>GREEN COVE SPRINGS, FL 32043<br>TEL: 904 284-0503<br>EMAIL: OPS@SMITHMARITIME.US | 3. Hirer/place of business<br>ADEDAPO ABIODAN<br>49 B, LADIPO BATEYE ST.<br>G.R.A<br>LAGOS, NIGERIA AFRICA |
| 4. Tow (name and type)<br>M - 300 TANK BARGE | 5. Gross tonnage/displacement tonnage<br>16,553 GRT |
| 6. Maximum length/maximum breadth & towing draught (fore and aft)<br>587 FT LONG X 92 FT BREATH X 7 '5 " FT DRAFT | 7. Flag and place of registry<br>USA |
| 8. Registered owners<br>ADEDAPO ABLIDAN | 9. Classification society<br>ABS A 1 |
| 10. P. & I. liability insurers<br>London Underwriters | 11. General condition of tow<br>SEA WORTHY |
| 12. Particulars of cargo and/or ballast and/or other property on board the tow<br>EMPTY SINGLE TANK BARGE TO BE TOWED IN BALLAST OFFSHORE TAMPA TO OFFSHORE LAGOS, NIGERIA. | |
| 13. Tug (name and type)<br>ELSBETH II OCEAN TOWBOAT | 14. Flag and place of registry<br>USA PALATKA, FL |
| 15. Gross tonnage<br>139 GRT | 16. Classification Society<br>ABS LOADLINE |
| 17. P. & I. liability insurers<br>LLOYD'S AND A+ US UNDERWRITERS | |
| 18. Certificated bollard pull (if any)<br>83 T | 19. Indicated horse power<br>6000 HP |
| 20. Estimated daily average bunker oil consumption in good weather and smooth water<br>(a) at full towing power with tow<br>2200 G / P / D<br>(b) at full sea speed without tow<br>1800 G / P / D | |
| 21. Winches and main towing gear<br>DOUBLE DRUM WINCH Almond Johnson<br>UPPER DRUM 1800 FT 2 1/4 ' LOWER DRUM 22000 FT 2 1/4 '<br>BRIDLES - SURGE CHAIN - AND RUNNING LIGHTS. | |

(continued)

This document is a computer generated TOWCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**EXHIBIT 1**

(continued) "TOWCON" INTERNATIONAL OCEAN TOWAGE AGREEMENT (LUMP SUM) PART I

NOTICES
For correct filling-in of Box 28, see instructions overleaf.

| | |
|---|---|
| 22. Nature of service(s) (Cl. 1)<br>TOWAGE OF ONE ( 1 ) EMPTY TANK BARGE FROM OFFSHORE TAMPA TO OFFSHORE LAGOS, NIGERIA. | 23. Contemplated route (Cl. 17)<br>SAFE AND CUSTOMARY ROUTE AT DISCRETION OF MASTER AND OWNERS. |
| 24. Place of departure (Cl. 7)<br>TAMPA, FL USA<br>25. Place of destination (Cl. 8)<br>OFFSHORE LAGOS, NIGERIA | |
| 26. Free time at place of departure (Cl. 2(g))<br>24 HRS | 27. Free time at place of destination (Cl. 2(g))<br>24 HRS |
| 28. Notices (Place of departure) (Cl. 7(c))<br>(a) Initial departure period (from/to)<br>JULY 10 - 17, 2009<br>(b) Initial departure notice (days notice/days period)<br>(c) Final departure period and notice (days notice/days period)<br>(d) Final departure time and date notice (days notice)<br>(e) Notices to be given to | 29. Delay payment (Cl. 2(g))<br>(a) Port rate<br>$ 9,000.00 PER DAY<br>(b) Sea rate<br>$ 9.000.00 PER DAY PLUS FUEL AND LUBE<br>30. Riding crew to be provided by (also state number to be provided) (Cl. 9)<br>N / A<br>31. If riding crew provided by Tugowner state amount per man per day payable by Hirer (Cl. 9)<br>N / A |
| 32. Lump sum towage price (also state when each instalment due and payable) (Cl. 2)<br>(a) Lump sum towage price<br>$ 1,075,000.00 USD<br>(b) amount due and payable on signing Agreement<br>10 % DUE UPON SIGNING CONTRACT<br>(c) amount due and payable on sailing of tug & tow from place of departure<br>30 % ON ARRIVAL TAMPA, FL.<br>(d) amount due and payable on passing of tug and tow off<br>30 % DUE AFTER PASSING 45 DEGREE WEST LONGITUDE<br>(e) amount due and payable on arrival of tug & tow at place of destination<br>BALANCE DUE UPON DELIVERY OFFSHORE LAGOS | 33. Payment of lump sum & other amounts (state currency, mode of payment, place of payment and bank account) (Cl. 2)<br>BANK WIRING INSTRUCTIONS:<br>BANK OF AMERICA<br>ABA# 026009593<br>1300 COOKS LANE<br>GREEN COVE SPRINGS, FLORIDA<br><br>FOR CREDIT TO:<br>SMITH MARITIME INC.<br>ACCOUNT # 898009157360 |
| 34. Interest rate (%) per annum to run from (state number of days) after any sum is due (Cl. 5)<br>1.5 % PER MONTH | 35. Security (state sum, by whom to be provided and when) (optional, only to be filled in if expressly agreed) (Cl. 6)<br>N / A |
| 36. Current cost of tug's bunker oil (also state type of bunkers) (Cl. 2(e))<br>INCLUDED IN LUMP SUM - FUEL CAP $ 1.85 USD PER US GALLON | 37. Cancelling date, if any agreed (Cl. 16(e))<br>PRIOR TO ARRIVAL IN TAMPA |
| 38. Cancellation fee (Cl. 16)<br>$ 268,750.00 USD | 39. Numbers of additional clauses, covering special provisions, if agreed<br>( 1 ) ONE - SEE SECTION 26 PART 2 |

It is mutually agreed between the party mentioned in Box 2 (hereinafter called "the Tugowner") and the party mentioned in Box 3 (hereinafter called "the Hirer") that the Tugowner shall, subject to the terms and conditions of this Agreement which consists of PART I including additional clauses, if any agreed and stated in Box 39, and PART II, use his best endeavours to perform the towage or other service(s) as set out herein. In the event of a conflict of terms and conditions, the provisions of PART I and any additional clauses, if agreed, shall prevail over those of PART II to the extent of such conflict but no further.

| | |
|---|---|
| Signature (Tugowner)<br>SMITH MARITIME INC. | Signature (Hirer)<br>ADEDAPO ABIODAN [signature] |

This document is a computer generated TOWCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

**1. The Tow**
"The Tow" shall include any vessel, craft or object of whatsoever nature including anything carried thereon as described in PART I to which the Tugowner agrees to render the service(s) as set out in Box 22.

**2. Price and Conditions of Payment**
(a) The Hirer shall pay the Tugowner the sum set in Box 32 (hereinafter called "the Lump Sum").

(b) The Lump Sum shall be payable as set out in Boxes 32 and 33.

(c) The Lump Sum and all other sums payable to the Tugowner under this Agreement shall be payable without any discount, deduction, set-off, lien, claim or counter-claim, each instalment of the Lump Sum shall be fully and irrevocably earned at the moment it is due as set out in Box 32, Tug and/or Tow lost or not lost, and all other sums shall be fully and irrevocably earned on a daily basis.

(d) All payments by the Hirer shall be made in the currency and to the bank account specified in Box 33.

(e) In the event that the average price per metric tonne of bunkers actually paid by the Tugowner differs from the amounts specified in Box 36 then the Hirer or the Tugowner, as the case may be, shall pay to the other the difference per metric tonne for every metric tonne consumed during the voyage. The average price specified above shall be the average of the prices per metric tonne actually paid by the Tugowner on the basis of quantities purchased at the last bunkering port prior to the voyage, any bunkering port during the voyage, and the first bunkering port after completion of the voyage. The log book of the Tug shall be prima facie evidence of the quantity of bunkers consumed.

(f) Any Delay Payment due under this Agreement shall be paid to the Tugowner as and when earned on presentation of the invoice.

(g) The Free Time specified in Boxes 26 and 27 shall be allowed for the connecting and disconnecting of the Tow and all other purposes relating thereto. Free Time shall commence when the Tug arrives at the pilot station at the place of departure or the Tug and Tow arrives at the pilot station at the place of destination or anchors or arrives at the usual waiting area off such places. Should the Free Time be exceeded, Delay Payment(s) at the rate specified in Box 29 shall be payable until the Tug and Tow sail from the place of departure or the Tug is free to leave the place of destination.

**3. Additional Charges and Extra Costs**
(a) The Hirer shall appoint his agents at the place of departure and place of *destination and ports of call or refuge and shall provide such agents with* adequate funds as required.

(b) The Hirer shall bear and pay as and when they fall due:-
(i) All port expenses, pilotage charges, harbour and canal dues and all other expenses of a similar nature levied upon or payable in respect of both the Tug and the Tow.
(ii) All taxes, (other than those normally payable by the Tugowner in the country where he has his principal place of business and in the country where the Tug is registered) stamp duties or other levies payable in respect of or in connection with this Agreement or the payments of the Lump Sum or other sums payable under this Agreement or the services to be performed under or in pursuance of this Agreement, any Customs or Excise duties and any costs, dues or expenses payable in respect of any necessary permits or licences.
(iii) The cost of the services of any assisting tugs when deemed necessary by the Tugmaster or prescribed by Port or other Authorities.
(iv) All costs and expenses necessary for the preparation of the Tow for towing (including such costs or expenses as those of raising the anchor of the Tow or tending or casting off any moorings of the Tow).
(v) The cost of insurance of the Tow shall be the sole responsibility of the Hirer to provide.

(c) All taxes, charges, costs, and expenses payable by the Hirer shall be paid by the Hirer direct to those entitled to them. If, however, any such tax, charge, cost or expense is in fact paid by or on behalf of the Tugowner (notwithstanding that the Tugowner shall under no circumstances be under any obligation to make such payments on behalf of the Hirer) the Hirer shall reimburse the Tugowner on the basis of the actual cost to the Tugowner upon presentation of invoice.

**4. War Risk Escalation Clause**
The Lump Sum is based and assessed on all war risk insurance costs applicable to the Tugowner in respect of the contemplated voyage in effect on the date of this Agreement.
In the event of any subsequent increase or decrease in the actual costs due to the Tugowner fulfilling his obligations under this Agreement, the Hirer or the Tugowner, as the case may be, shall reimburse to the other the amount of any increase or decrease in the war risk, confiscation, deprivation or trapping insurance costs.

**5. Interest**
If any amounts due under this Agreement are not paid when due, then interest shall accrue and shall be paid in accordance with the provisions of Box 34, on all such amounts until payment is received by the Tugowner.

**6. Security**
*The Hirer undertakes to provide, if required by the Tugowner, security to the* satisfaction of the Tugowner in the form and in the sum, at the place and at the time indicated in Box 35 as a guarantee for due performance of the Agreement. Such security shall be returned to the guarantor when the Hirer's financial obligations under this Agreement have been met in full. (Optional, only applicable if Box 35 filled in).

**7. Place of Departure/Notices**
(a) The Tow shall be tendered to the Tugowner at the place of departure stated in Box 24.

(b) The precise place of departure shall always be safe and accessible for the Tug to enter, to operate in and for the Tug and Tow to leave and shall be a place where such Tug is permitted to commence the towage in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the Tugowner which shall not be unreasonably withheld.

(c) (i) The Tow shall be ready to sail from the Place of Departure between the dates indicated in Box 28 (a), hereinafter called the Initial Departure Period.
(ii) The Hirer shall give the Tugowner such notice as is stipulated in Box 28 in respect of Initial Departure Notice (Box 28 (b)), Final Departure Period Notice (Box 28 (c)) and Final Departure Time and Date Notice (Box 28 (d)).
(iii) The Tow shall be offered to the Tugowner, duly certificated and otherwise in accordance with the terms and conditions of this Agreement.

(d) If the Hirer fails to comply strictly with the provisions of Cl. 7(c) the date of departure shall be deemed to be either the last day of the Initial Departure Period or the last day of the Final Departure Period, whichever is earlier, and this date shall be binding for all consequences arising in respect of Delay Payments and any other payments due or charges incurred in the performance of this Agreement.

**8. Place of Destination**
(a) The Tow shall be accepted forthwith and taken over by the Hirer or his duly authorised representative at the place of destination stated in Box 25.

(b) The precise place of destination shall always be safe and accessible for The Tug and Tow to enter, to operate in, and for the Tug to leave and shall be a place where such Tug is permitted to redeliver the Tow in accordance with any local or other rules, requirements or regulations and shall always be subject to the approval of the Tugowner, which approval shall not be unreasonably withheld.

**9. Riding Crew**
(a) In the event that the Tugowner provides a Riding Crew for the Tow, such crew and their suitability for the work shall be in the discretion of the Tugowner. All expenses for such personnel shall be for the account of the Tugowner.

(b) In the event that any personnel are placed on board the Tow by the Hirer all expenses for such personnel will be for the account of the Hirer and such personnel shall be at all times under the orders of the Master of the Tug, but shall not be deemed to be the servants or agents of the Tugowner.

(c) The Riding Crew shall be provided at the Hirer's sole expense with suitable accomodation, food, fresh water, life saving appliances and all other requirements to comply as necessary with the law and regulations of the law of the Flag of the Tug and/or Tow and of the States through the territorial waters of which the Tug will pass or enter. It is a requirement that members of the Riding Crew provided by the Hirer shall be able to speak and understand the English language or any other mutual language.

**10. Towing Gear and Use of Tow's Gear**
(a) The Tugowner agrees to provide free of cost to the Hirer all towing hawsers, bridles and other towing gear normally carried on board the Tug, for

This document is a computer generated TOWCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

the purpose of the towage or other services to be provided under this Agreement. The Tow shall be connected up in a manner within the discretion of the Tugowner.

(b) The Tugowner may make reasonable use at his discretion of the Tow's gear, power, anchors, anchor cables, radio, communication and navigational equipment and all other appurtenances free of cost during and for the purposes of the towage or other services to be provided under this Agreement.

**11. Permits and Certification**

(a) The Hirer shall arrange at his own cost and provide to the Tugowner all necessary licenses, authorisations and permits required by the Tug and Tow to undertake and complete the contractual voyage together with all necessary certification for the Tow to enter or leave all or any ports of call or refuge on the contemplated voyage.

(b) Any loss or expense incurred by the Tugowner by reason of the Hirer's failure to comply with this Clause shall be reimbursed by the Hirer to the Tugowner and during any delay caused thereby the Tugowner shall receive additional compensation from the Hirer at the Tug's Delay Payment rate specified in Box 29.

**12. Tow-worthiness of the Tow**

(a) The Hirer shall exercise due diligence to ensure that the Tow shall, at the commencement of the towage, be in all respects fit to be towed from the place of departure to the place of destination.

(b) The Hirer undertakes that the Tow will be suitably trimmed and prepared and ready to be towed at the time when the Tug arrives at the place of departure and fitted and equipped with such shapes, signals, navigational and other lights of a type required for the towage.

(c) The Hirer shall supply to the Tugowner or the Tugmaster, on the arrival of the Tug at the place of departure an unconditional certificate of tow-worthiness for the Tow issued by a recognised firm of Marine Surveyors or Survey Organisation, provided always that the Tugowner shall not be under any obligation to perform the towage until in his discretion he is satisfied that the Tow is in all respects trimmed, prepared, fit and ready for towage but the Tugowner shall not unreasonably withhold his approval.

(d) No inspection of the Tow by the Tugowner shall constitute approval of the Tow's condition or be deemed a waiver of the foregoing undertakings given by the Hirer.

**13. Seaworthiness of the Tug**

The Tugowner will exercise due diligence to tender the Tug at the place of departure in a seaworthy condition and in all respects ready to perform the towage, but the Tugowner gives no other warranties, express or implied.

**14. Substitution of Tugs**

The Tugowner shall at all times have the right to substitute any tug or tugs for any other tug or tugs of adequate power (including two or more tugs for one, or one tug for two or more) at any time whether before or after the commencement of the towage or other services and shall be at liberty to employ a tug or tugs belonging to other tugowners for the whole or part of the towage or other service contemplated under this Agreement. Provided however, that the main particulars of the substituted tug or tugs shall be subject to the Hirer's prior approval, but such approval shall not be unreasonably withheld.

**15. Salvage**

(a) Should the Tow break away from the Tug during the course of the towage service, the Tug shall render all reasonable services to re-connect the towline and fulfil this Agreement without making any claim for salvage.

(b) If at any time the Tugowner or the Tugmaster considers it necessary or advisable to seek or accept salvage services from any vessel or person on behalf of the Tug or Tow, or both, the Hirer hereby undertakes and warrants that the Tugowner or his duly authorised servant or agent including the Tugmaster have the full actual authority of the Hirer to accept such services on behalf of the Tow on any reasonable terms.

**16. Cancellation and Withdrawal**

(a) At any time prior to the departure of the Tow from the place of departure the Hirer may cancel this Agreement upon payment of the cancellation fee set out in Box 38. If cancellation takes place whilst the Tug is en route to the place of departure or after the Tug has arrived at or off the place of departure then in addition to the said cancellation fee the Hirer shall pay any additional amounts due under this Agreement.

(b) In the event that the towage operation is terminated after departure from the place of departure, but before the Tow arrives at the place of destination without fault on the part of the Tugowner, his servants or agents, the Tugowner shall be entitled to be paid, and if already paid to retain all sums payable according to Box 32, accrued Delay Payments and any other amounts due under this Agreement. The above amounts are in addition to any damages the Tugowner may be entitled to claim for breach of this Agreement.

(c) The Tugowner may without prejudice to any other remedies he may have leave the Tow in a place where the Hirer may take repossession of it and be entitled to payment of the Lump Sum less expenses saved by the Tugowner and all other payments due under this Agreement, upon any one or more of the following grounds:

(i) If there is any delay or delays (other than delay caused by the Tug) at the place of departure exceeding in aggregate 21 running days.
(ii) If there is any delay or delays (other than a delay caused by the Tug) at any port or place of call or refuge exceeding in aggregate 21 running days.
(iii) If the security as may be required according to Box 35 is not given within 7 running days of the Tugowner's request to provide security.
(iv) If the Hirer has not accepted the Tow within 7 running days of arrival at the place of destination.
(v) If any amount payable under this Agreement has not been paid within 7 running days of the date such sums are due.

(d) Before exercising his option of withdrawing from this Agreement as aforesaid, the Tugowner shall if practicable give the Hirer 48 hours notice (Saturdays, Sundays and public Holidays excluded) of his intention so to withdraw.

(e) Should the Tug not be ready to commence the towage at the latest at midnight on the date, if any, indicated in Box 37, the Hirer shall have the option of cancelling this Agreement and shall be entitled to claim damages for detention if due to the wilful default of the Tugowner. Should the Tugowner anticipate that the Tug will not be ready, he shall notify the Hirer thereof by telex, cable or otherwise in writing without delay stating the expected date of the Tug's readiness and ask whether the Hirer will exercise his option to cancel. Such option to cancel must be exercised within 48 hours after the receipt of the Tugowner's notice, otherwise the third day after the date stated in the Tugowner's notice shall be deemed to be the new agreed date to commence the towage in accordance with this Agreement.

**17. Necessary Deviation or Slow Steaming**

(a) If the Tug during the course of the towage or other service under this Agreement puts into a port or place or seeks shelter or is detained or deviates from the original route as set out in Box 23, or slow steams because either the Tugowner or Tugmaster reasonably consider

(i) that the Tow is not fit to be towed or
(ii) the Tow is incapable of being towed at the original speed contemplated by the Tugowner or
(iii) the towing connection requires rearrangement, or
(iv) repairs or alterations to or additional equipment for the Tow are required to safeguard the venture and enable the Tow to be towed to destination, or
(v) it would not be prudent to do otherwise on account of weather conditions actual or forecast, or

because of any other good and valid reason outside the control of the Tugowner or Tugmaster, or because of any delay caused by or at the request of the Hirer, this Agreement shall remain in full force and effect, and the Tugowner shall be entitled to receive from the Hirer additional compensation at the appropriate Delay Payment rate as set out in Box 29 for all time spent in such port or place and for all time spent by the Tug at sea in excess of the time which would have been spent had such slow steaming or deviation not taken place.

(b) The Tug shall at all times be at liberty to go to the assistance of any vessel in distress for the purpose of saving life or property or to call at any port or place for bunkers, repairs, supplies, or any other necessaries or to land disabled seamen, but if towing the Tug shall leave the Tow in a safe place and during such period this Agreement shall remain in full force and effect.

(c) The Tug shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery, requisition or otherwise howsoever given by the Government of the Nation under whose flag the Tug or Tow sails or any department thereof, or any person acting or purporting to act with the authority for such Government or any department thereof by the committee or person having under the terms of the War Risks Insurance on the Tug the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or is not done the same shall not be deemed a de-

This document is a computer generated TOWCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

viation and delivery in accordance with such orders or directions shall be a fulfilment of this Agreement and the Lump Sum and/or all other sums shall be paid to the Tugowner accordingly.

(d) Any deviation howsoever or whatsoever by the Tug or by the Tugowner not expressly permitted by the terms and conditions of this Agreement shall not amount to a repudiation of this Agreement and the Agreement shall remain in full force and effect notwithstanding such deviation.

**18. Liabilities**

1. (a) The Tugowner will indemnify the Hirer in respect of any liability adjudged due or claim reasonably compromised arising out of injury or death occurring during the towage or other service hereunder to any of the following persons:

(i) The Master and members of the crew of the Tug and any other servant or agent of the Tugowner;
(ii) The members of the Riding Crew provided by the Tugowner or any other person whom the Tugowner provides on board the Tow;
(iii) Any other person on board the Tug who is not a servant or agent of the Hirer or otherwise on board on behalf of or at the request of the Hirer.

(b) The Hirer will indemnify the Tugowner in respect of any liability adjudged due or claim reasonably compromised arising from injury or death occurring during the towage or other service hereunder to any of the following persons:

(i) The Master and members of the crew of the Tow and any other servant or agents of the Hirer;
(ii) Any other person on board the Tow for whatever purpose except the members of the Riding Crew or any other persons whom the Tugowner provides on board the Tow pursuant to their obligations under this Agreement.

2. (a) The following shall be for the sole account of the Tugowner without any recourse to the Hirer, his servants, or agents, whether or not the same is due to breach of contract, negligence or any other fault on the part of the Hirer, his servants or agents:

(i) Loss or damage of whatsoever nature, howsoever caused to or sustained by the Tug or any property on board the Tug.
(ii) Loss or damage of whatsoever nature caused to or suffered by third parties or their property by reason of contact with the Tug or obstruction created by the presence of the Tug.
(iii) Loss or damage of whatsoever nature suffered by the Tugowner or by third parties in consequence of the loss or damage referred to in (i) and (ii) above.
(iv) Any liability in respect of wreck removal or in respect of the expense of moving or lighting or buoying the Tug or in respect of preventing or abating pollution originating from the Tug.

The Tugowner will indemnify the Hirer in respect of any liability adjudged due to a third party or any claim by a third party reasonably compromised arising out of any such loss or damage. The Tugowner shall not in any circumstances be liable for any loss or damage suffered by the Hirer or caused to or sustained by the Tow in consequence of loss or damage howsoever caused to or sustained by the Tug or any property on board the Tug.

(b) The following shall be for the sole account of the Hirer without any recourse to the Tugowner, his servants or agents, whether or not the same is due to breach of contract, negligence or any fault on the part of the Tugowner, his servants or agents:

(i) Loss or damage of whatsoever nature, howsoever caused to or sustained by the Tow.
(ii) Loss or damage of whatsoever nature caused to or suffered by third parties or their property by reason of contact with the Tow or obstruction created by the presence of the Tow.
(iii) Loss or damage of whatsoever nature suffered by the Hirer or by third parties in consequence of the loss or damage referred to in (i) and (ii) above.
(iv) Any liability in respect of wreck removal or in respect of the expense of moving or lighting or buoying the Tow or in respect of preventing or abating pollution originating from the Tow.

The Hirer will indemnify the Tugowner in respect of any liability adjudged due to a third party or any claim by a third party reasonably compromised arising out of any such loss or damage but the Hirer shall not in any circumstances be liable for any loss or damage suffered by the Tugowner or caused to or sustained by the Tug in consequence of loss or damage, howsoever caused to or sustained by the Tow.

3. Save for the provisions of Clauses 11,12,13 and 16 neither the Tugowner nor the Hirer shall be liable to the other party for loss of profit, loss of use, loss of production or any other indirect or consequential damage for any reason whatsoever.

4. Notwithstanding any provisions of this Agreement to the contrary, the Tugowner shall have the benefit of all limitations of, and exemptions from, liability accorded to the Owners or Chartered Owners of Vessels by any applicable statute or rule of law for the time being in force and the same benefits are to apply regardless of the form of signatures given to this Agreement.

**19. Himalaya Clause**

All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Agreement or by any applicable statute rule or regulation for the benefit of the Tugowner or Hirer shall also apply to and be for the benefit of demise charterers, sub-contractors, operators, master, officers and crew of the Tug or Tow and to and be for the benefit of all bodies corporate parent of, subsidiary to, affiliated with or under the same management as either of them, as well as all directors, officers, servants and agents of the same and to and be for the benefit of all parties performing services within the scope of this Agreement for or on behalf of the Tug or Tugowner or Hirer as servants, agents and sub-contractors of such parties. The Tugowner or Hirer shall be deemed to be acting as agent or trustee of and for the benefit of all such persons, entities and vessels set forth above but only for the limited purpose of contracting for the extension of such benefits to such persons, bodies and vessels.

**20. War and Other Difficulties**

(a) If owing to any Hostilities; War or Civil War; Acts of Terrorism; Acts of Public Enemies; Arrest or Restraint of Princes, Rulers or People; Insurrections; Riots or Civil Commotions; Disturbances; Acts of God; Epidemics; Quarantine; Ice; Labour Troubles; Labour Obstructions; Strikes; Lock-outs; Embargoes; Seizure of the Tow under Legal Process or for any other cause outside the control of the Tugowner it would be impossible or unsafe or commercially impracticable for the Tug or Tow or both to leave or attempt to leave the place of departure or any port or place of call or refuge or to reach or enter or attempt to reach or enter the port or place of destination of the Tow and there deliver the Tow and leave again, all of which safely and without unreasonable delay, the Tug may leave the Tow or any part thereof at the place of departure or any other port or place where the Hirer may take repossession and this shall be deemed a due fulfilment by the Tugowner of this Agreement and any outstanding sums and all extra costs of delivery at such place and any storage costs incurred by the Tugowner shall thereupon become due and payable by the Hirer.

(b) If the performance of this Agreement or the voyage to the place of departure would in the ordinary course of events require the Tug and/or Tow to pass through or near to an area where after this Agreement is made there is or there appears to be danger of such area being blocked or passage through being restricted or made hazardous by reason of War, Acts of Terrorism, Trapping of Vessels, Civil War, Acts of Public Enemies, Arrest or Restraint of Princes, Rulers or People, Insurrection, Riots or Civil Commotions or Disturbances or other dangers of a similar nature then:

(i) If the Tug has not entered such area en route to the place of departure, or having entered has become trapped therein, the Hirer shall pay a Delay Payment at the rate specified in Box 29 for every day of the resulting delay. Provided that if the delay is for a period of more than 14 days either party hereto shall be entitled to terminate this Agreement by telex, cable or other written notice in which event, save for liabilities already accrued, neither party shall be under any further liability to the other but the Tugowner shall not be bound to repay to the Hirer any payments already made and all amounts due shall remain payable.
(ii) If the Tug and Tow whilst en route to the place of destination have not entered such area during the course of the towage or other service the Hirer shall pay Delay Payment at the rate indicated in Box 29 for every day by which the towage is prolonged by reason of waiting for such area to become clear and/or safe and/or by reason of proceeding by a longer route to avoid or pass such area in safety.
(iii) If the Tug and Tow whilst en route to the place of destination have become trapped in such area during the course of the towage or other service, the Hirer shall pay a Delay Payment at the rate specified in Box 29 for every day of the resulting delay. Provided that if the delay is for a period of more than 14 days either party hereto shall be entitled to terminate this Agreement by telex, cable or other written notice in which event, save for liabilities already accrued, neither party shall be under any further liability to the other but the Tugowner shall not be bound to repay to the Hirer any payment already made and all amounts due shall remain payable.

This document is a computer generated TOWCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



## PART II
## "Towcon" International Ocean Towage Agreement (Lump Sum)

**21. Lien**

Without prejudice to any other rights which he may have, whether in rem or in personam, the Tugowner, by himself or his servants or agents or otherwise shall be entitled to exercise a possessory lien upon the Tow in respect of any sum howsoever or whatsoever due to the Tugowner under this Agreement and shall for the purpose of exercising such possessory lien be entitled to take and/or keep possession of the Tow; provided always that the Hirer shall pay to the Tugowner all reasonable costs and expenses howsoever or whatsoever incurred by or on behalf of the Tugowner in exercising or attempting or preparing to exercise such lien and the Tugowner shall be entitled to receive from the Hirer the Tug's Delay Payment at the rate specified in Box 29 for any reasonable delay to the Tug resulting therefrom.

**22. Warranty of Authority**

If at the time of making this Agreement or providing any service under this Agreement other than towing at the request, express or implied, of the Hirer, the Hirer is not the Owner of the Tow referred to in Box 4, the Hirer expressly represents that he is authorised to make and does make this Agreement for and on behalf of the Owner of the said Tow subject to each and all of these conditions and agrees that both the Hirer and the Owner of the Tow are bound jointly and severally by these conditions.

**23. General**

(a) If any one or more of the terms, conditions or provisions in this Agreement or any part thereof shall be held to be invalid, void or of no effect for any reason whatsoever, the same shall not affect the validity of the remaining terms, conditions or provisions which shall remain and subsist in full force and effect.

(b) For the purpose of this Agreement unless the context otherwise requires the singular shall include the plural and vice versa.

(c) Any extension of time granted by the Tugowner to the Hirer or any indulgence shown relating to the time limits set out in this Agreement shall not be a waiver of the Tugowner's right under this Agreement to act upon the Hirer's failure to comply with the time limits.

**24. Time for Suit**

Save for the indemnity provisions under Clause 18 of this Agreement, any claim which may arise out of or in connection with this Agreement or of any towage or other service to be performed hereunder shall be notified by telex, cable or otherwise in writing within 6 months of delivery of the Tow or of the termination of the towage or other service for any reason whatever, and any suit shall be brought within one year of the time when the cause of action first arose. If either of these conditions is not complied with the claim and all rights whatsoever and howsoever shall be absolutely barred and extinguished.

**25. Law and Jurisdiction**

This Agreement shall be construed in accordance with and governed by USA English law. Any dispute or difference which may arise out of or in connection with this Agreement or the services to be performed hereunder shall be referred to the High Court of Justice JACKSONVILLE, FLORIDA ~~in London~~. No suit shall be brought in any other state or jurisdiction except that either party shall have the option to bring proceedings in rem to obtain conservative seizure or other similar remedy against any vessel or property owned by the other party in any state or jurisdiction where such vessel or property may be found.

26. AMOUNT TO BE DEPOSITED IN ESCROW ACCOUNT $ 75,000.00 USD - FOR THE PURPOSE AND ANY ADDITIONAL EXPENSES, COSTS AND OR DEMURRAGE DUE TO WEATHER OR DIVERSION IN ROUTE DURING VOYAGE.

This document is a computer generated TOWCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.